# Richmond

G. WALTER MAPP, ADM'R, ETC. V. AARON S. BYRD, ET ALS.

January 13, 1938.

Present, Campbell, C. J., and Holt, Hudgins, Browning
and Spratley, JJ.

The opinion states the case.

*James G. Martin & Son* and *G. Walter Mapp*, for the appellants.

*Gunter & Gunter, George L. Doughty, Jr.,* and *Stewart K. Powell,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

The two controversies presented by this appeal are: (1) The allowance of commissions to John Abbott Byrd and Aaron S. Byrd, committees of Margaret E. S. Byrd; and (2) the amount of rents that the committees received or should have received from the real estate owned by the incompetent.

The litigation is between relatives and personal representatives of deceased members of the same family. It involves transactions extending through a period of years, and directly or indirectly the settlement of the following estates: (1) The estate of Mary Virginia Byrd, the mother of four sons, Charles W., John Abbott, William W., and Aaron S. Byrd; (2) the estate of Charles L. Byrd, the husband of Mary Virginia Byrd, and the father of the four sons named; (3) the estates of three of the sons, to-wit: William W. Byrd, Charles W. Byrd, and John Abbott Byrd; and (4) the estate of Margaret E. S. Byrd and the transactions of her committees from April, 1925, to the day of her death, December 31, 1933.

Mary Virginia Byrd died in 1912, leaving considerable personal property and real estate. John Abbott Byrd quali-

fied as administrator. He filed no inventory and made no settlement of his account before the commissioner. Each of the four sons received his part of the personal property, amounting to $4,000. This distribution was not made in strict accord with the statute, but it was satisfactory to all parties concerned.

Charles L. Byrd, the father of these four sons, died in 1925. His children settled his estate between them without the qualification of any administrator. Mr. Byrd owned a house and lot in the town of Parksley, and at the time of his death, he owed the Accomack Banking Company a note for $5,000. The house and lot were sold by the sons for $2,750, which amount was applied on the debt due by their father to the bank. This left an unpaid balance of $2,250. The note showing this balance due was assigned by the Accomack Banking Company to Aaron S. Byrd and the indebtedness of Charles L. Byrd assumed by him. Charles W. Byrd and John Abbott Byrd agreed to pay their part, or one-third each.

William W. Byrd was an invalid. It seems that he did not assume any part of this debt. He died in 1927, unmarried and without issue. At the time of his death, the Accomack Banking Company held his note for $919. Charles W. Byrd, John Abbott Byrd and Aaron S. Byrd, without requiring anyone to qualify as administrator, handled this indebtedness in the same way that they had handled their father's estate. Aaron S. Byrd assumed the debt, and each brother agreed to pay him one-third of the obligation, as each heir was entitled to one-third of the estate, real and personal, of which William W. Byrd died seized and possessed. The money on deposit in the bank to the credit of this decedent, with the consent of the bank, was used by the three brothers in payment of his open accounts, including doctors' bills, burial expenses, etc. Charles W. Byrd seems to have been indebted to William W. Byrd in the sum of $2,000, evidenced by two bonds of $1,000 each, one bearing date October 7, 1914, subject to sundry small credits, and the other bearing date January 1, 1918.

By the will of Margaret E. S. Byrd, bearing date November 24, 1914, the four Byrd brothers were bequeathed and devised the bulk of her property. Minor changes were made in a codicil dated December 1, 1914. Sometime after this will was executed, testatrix became *non compos mentis,* and her husband E. P. Byrd qualified as committee. He resigned in April, 1925, and soon thereafter died. At this time Mrs. Byrd was confined at Relay Sanitorium, in Maryland, where the charge for her support and maintenance was $150 per month. It was agreed by the Byrd brothers that John Abbott and Aaron S. Byrd should act as committees for their aunt. These committees received $2,301.25 in cash and assumed the management of several farms, the only source of income of the estate.

According to the testimony of Aaron S. Byrd, the brothers agreed that he should take charge of the farms and pay the estate the sum of $1,600 per year rent. Later, by agreement of the brothers, the amount of the rent was raised to $1,800 per year. The committees continued to pay the sanitarium $1,800 per year for the support and maintenance of the incompetent until October, 1931.

Charles W. Byrd was a practicing physician in New York. He kept in close touch with the situation in Accomac by visiting the brothers several times each year. At his suggestion, Mrs. Byrd, in October, 1931, was brought to her home in Accomac, where she remained under the care and supervision of Aaron S. Byrd until her death in December, 1933. For the support and maintenance of Mrs. Byrd, during the last two years of her life, the brothers agreed that Aaron S. Byrd should be paid a certain stipulated sum which was duly allowed by the trial court.

In September, 1933, Dr. Charles W. Byrd died intestate, leaving a widow, Sally J. Byrd, and one child, Jacqueline C. Byrd, an infant, who became of age before the final hearing of this cause. These parties, upon investigation, found that John Abbott Byrd and Aaron S. Byrd, as committees, had made no settlement of their accounts, and that there had been no qualification on the estate of William W. Byrd. On

March 17, 1934, G. Walter Mapp qualified as administrator on the estate of William W. Byrd. Later John Abbott Byrd filed an account of the committees of Margaret E. S. Byrd. This account showed that the estate was $3,481.33 in debt to the committees for money advanced. Exceptions were filed to this report by the administrator of William W. Byrd and Sally J. Byrd, the administratrix of Charles W. Byrd, in her own right, and as next friend of her daughter Jacqueline C. Byrd.

On February 6, 1936, John Abbott Byrd died intestate. B. T. Gunter qualified as administrator on this estate. Shortly thereafter, Aaron S. Byrd and his wife instituted this suit in which the settlements of the estates above named were thrown into equity, the past transactions of the parties were set forth with the prayer that all matters in controversy between the parties be settled in one suit. Answers and cross-bills were filed, various charges and countercharges were made. Evidence was taken *ore tenus* before the trial judge, who entered a ten page decree disposing of the various issues.

The administrator of William W. Byrd, Sally J. Byrd, administratrix, and in her own right, and Jacqueline C. Byrd, now contend that the trial court erred in allowing Aaron S. Byrd and the estate of John Abbott Byrd commissions as committees on the estate of Margaret E. S. Byrd. This contention is based on the provisions of Code, section 5409, reading: "If any such fiduciary wholly fail to lay before such commissioner a statement of receipts for any year, within six months after its expiration, and though a statement be laid before the commissioner, yet if such fiduciary be found chargeable for that year with any money, not embraced in the said statement, he shall have no compensation for his services during said year, nor commission on such money, unless allowed by the court. This section shall not apply to a case in which, within six months after the end of any year, such fiduciary shall have given to the parties entitled to the money received in such year, a state-

ment of the said money, and actually settled therefor with them; * * *."

The real question presented is whether the trial judge abused the discretion the statute imposed upon him, in allowing commissions. The rights of no creditors are involved. The cash received by the committee and the annual income from the estate was not sufficient to pay for the support of the incompetent, the taxes, repairs and upkeep of the property during the period covered by the report. All liquid assets and more than the total income were spent by the committee on the maintenance and support of the incompetent. While no actual settlement was made or could have been made with Margaret E. S. Byrd, the beneficiaries under her will had full knowledge of the assets of the estate, and approved its management and the distribution made. It appears that Margaret E. S. Byrd was given every care and comfort that was reasonably possible. Under these circumstances, we can not say that the trial court abused its discretion in allowing commissions on the money actually collected and disbursed by the committees.

The facts presented in this case are quite different from the facts presented in the case of *McCready* v. *Lyon*, 167 Va. 103, 187 S. E. 442. In that case, the administrator simply held the money owned by the estate for a period of twenty-five years. He paid the beneficiaries a part of the fund from time to time, and although often requested to make a settlement, failed to do so. In the case at bar, the beneficiaries were four brothers. Two of them were acting as fiduciaries. The fiduciaries spent more money than came into their hands on the support and maintenance of their ward. Each owed the estate, or the other, money, for which they had executed notes. They knew that Mrs. Byrd's condition was hopeless, and they postponed a final settlement of her estate, and a settlement between themselves until after her death. While Aaron S. Byrd testified that there was no particular reason for them to have failed to make a settlement of their accounts, they left all legal matters to John Abbott Byrd, the attorney in the family, and he simply

failed to make up the account until after the death of Charles W. Byrd and Margaret E. S. Byrd. A settlement of the accounts would have given the beneficiaries no additional information.

Charles W. Byrd, Aaron S. Byrd and John Abbott Byrd each was indebted, either to the estate of William W. Byrd, or to the committee of Margaret E. S. Byrd. Aaron S. Byrd testified, "We owed each other and we all knew the bonds were in there and nobody made any attempt to force collection. It all belonged to us. Charlie knew I owed the estate and Abbott did, and he knew he owed us, and we were familiar with it, and simply waiting to clarify the whole thing at Aunt Sallie's death." (Meaning Mrs. Margaret E. S. Byrd.)

On each obligation the statute of limitations was plead. The court held that the statute was a bar to recovery on the notes executed by Charles W. Byrd to William W. Byrd. A recovery was allowed on the obligations executed by Aaron S. Byrd and John Abbott Byrd on the ground that it was their duty as committees to collect the bonds before the statute of limitations ran against them, and that they were not relieved of this duty by the acquiescence of Charles W. Byrd in their management of the estate of Margaret E. S. Byrd.

In charging the committee with the amount of these bonds, the court allowed commissions. That part of the commissions allowed on these items to which the estate of Charles W. Byrd would be entitled is very small, less than $100. Considering the relationship of the Byrd brothers during the entire time that two of them acted as committees, and the peculiar facts and circumstances of the case, we can not say that the allowance of commissions on these items constitutes reversible error.

The burden of proof was upon Aaron S. Byrd to establish that his contract of rental with the estate of Margaret E. S. Byrd was fair and equitable. He testified that he rented the farm lands from 1925 to 1930 at an annual rent of $1,600 and after 1930 at $1,800 per year. The sub-

stance of his testimony is that the rental value of these farms after 1930 was not as much as $1,800 but that due to the fact that the expenses of the estate including the support and maintenance of Margaret E. S. Byrd exceeded that amount, and knowing that he and his brothers would ultimately obtain the property, he agreed to pay the increased rent.

Appellants attack these contracts of rental, not on the ground that the sums agreed to be paid, and which were paid, were not fair and equitable, but on the ground that Aaron S. Byrd's testimony was not corroborated as required by Code, section 6209. To impeach this testimony, appellants introduced two witnesses, H. B. Jordan, an attorney living in Bedford and representing the widow of Charles W. Byrd, and Joseph E. Johnson, a brother of the widow. These witnesses testified that when they went to Accomac to look after the interests of the widow, Aaron S. Byrd told them that he had agreed to rent the lands of Margaret E. S. Byrd for $2,000 a year, from 1925 to 1933 inclusive.

Aaron S. Byrd denied that he made any such statement. He testified that in addition to the farm lands in question, he rented another farm owned by Charles W. Byrd for which he paid $400 per year, and that if he said anything about $2,000 per year, he was talking about the joint rentals of the farms owned by the two different parties. The only other witness who testified on the subject was J. Merritt Chandler, who stated that he was familiar with the farm lands of Margaret E. S. Byrd, and that the stipulated rent of $1,600 and $1,800 per year "was plenty" for them, during that period.

If we eliminate the testimony of Aaron S. Byrd and the two witnesses who contradict him, there remains the undenied evidence that Aaron S. Byrd paid the full rental value of the lands during the period mentioned, and the evidence of the rental contract set forth in the account, made and filed by John Abbott Byrd, one of the committees and one-third owner of the entire estate. This evidence is suf-

ficient to support the conclusion of the learned chancellor without discussing the question of corroboration.

The settlement of these estates involved transactions between members of the same family extending over a period of years. The trial judge saw and heard the witnesses testify, his decision of each matter in controversy is supported by evidence, his conclusion on the whole case appears to be fair and equitable, and we therefore affirm the decree.

*Affirmed.*